The judgment below homologated the account as rendered.

In cases of insolvency and succession, the Supreme Court has jurisdiction where "the fund to be distributed, whatever may be the amount therein claimed, shall exceed two thousand dollars, exclusive of interest." Const. art. 85.

"In cases of insolvency, the test is, not the amount actually distributed under a provisional account, but the amount of the fund to be distributed in the case." In re New Iberia Cotton Mills Co., 113 La. 406, 37 South. 8, citing Brierre & Sons v. Their Creditors, 43 La. Ann. 423, 9 South. 640, the doctrine of which was approved in Succession of Romero, 43 La. Ann. 977, 9 South. 919, as shown by the following extract: "In a case decided recently, it was held that successive accounts filed by a syndic, distributing the fractional part of a fund exceeding $2,000, will not divest [the] court of jurisdiction."

The omitted items formed parts of the inventoried assets of the succession, for which the executor was bound to account to the heirs.

Motion overruled.

(75 South. 743)

No. 22335.

JEFFERSON AND PLAQUEMINES DRAINAGE DIST. v. WHITNEY–CENTRAL TRUST & SAVINGS BANK.

(May 14, 1917.   Rehearing Denied June 11, 1917.)

*(Syllabus by the Court.)*

DRAINS ⬯18—DRAINAGE COMMISSIONERS—DIVISION OF DISTRICT INTO SUBDISTRICTS—STATUTE.

The board of commissioners of a drainage district is, by the terms of section 1 of Act No. 227 of 1914, authorized to divide the drainage district into subdistricts, by a simple resolution to that effect, defining the limits of the subdistricts, and incur an additional debt against the land in the subdistrict, whenever the board deems it necessary or expedient for the better drainage of the district; and the authority of the board, in that respect, is not exhausted or destroyed by the fact that a debt has been incurred and bonds have been issued by the board of commissioners against all of the lands in the district, on a petition signed by the owners of two-thirds in area of all of the land in the district, to drain and reclaim the entire district as a unit.

[Ed. Note.—For other cases, see Drains, Cent. Dig. §§ 11, 13.]

Appeal from Civil District Court, Parish of Orleans; Porter Parker, Judge.

Action by the Jefferson and Plaquemines Drainage District against the Whitney-Central Trust & Savings Bank, in which certain other parties intervened. Judgment for defendant dismissing the suit, and plaintiff and interveners appeal. Judgment annulled, and judgment rendered for plaintiff.

Wm. Winans Wall and Dart, Kernan & Dart, all of New Orleans, for appellants. Robert L. Rivarde, Dist. Atty., for plaintiff appellant. Foster, Milling, Saal & Milling, of New Orleans, for appellee.

### Statement of the Case.

O'NIELL, J.   The Jefferson and Plaquemines drainage district was organized in the early part of the year 1912, under the provisions of the Act No. 317 of 1910. The area of the district is approximately 26,000 acres.

At a meeting of the board of commissioners, in May, 1912, a petition signed by the owners of more than two-thirds in area of all the land within the district was presented, alleging that the land comprising the district was of that character that it had to be levied and pumped to drain and reclaim it, and asking that the board of commissioners have the land surveyed and the cost of draining and reclaiming all of it ascertained, and that the board issue negotiable bonds for an amount sufficient to drain and reclaim all of the land within the district. Thereupon a

resolution was adopted by the board, requesting the board of state engineers to survey all the land within the district and make an estimate of the cost of draining it adequately and completely. The state engineers made the survey and estimate, and in October, 1912, submitted to the board of commissioners of the drainage district a complete and exhaustive report, advising that the drainage and reclamation of the district, by means of canals, levees, and pumps, was practicable and feasible, and estimating the cost of the work at about $14 an acre, a total of $358,500. In their report, the engineers recommended that, as a large area of the land within the district was "wet land" that could not be immediately put under cultivation, and as the run-off of rainfall within the district would increase when the low lands would be cleared and cultivated, the economic method of procedure would be to provide the pumping capacity and canal capacity then necessary to take away the run-off of rainfall, with a safe margin of capacity, and, when necessary, to increase the canal and pumping capacity to the maximum that would be required ultimately for the drainage of the entire district. The detailed statement of the engineers showed that the initial cost of installation would be $208,500, leaving a margin of $150,000 to be expended for future installation to complete the drainage of the entire district. At the meeting of the board of commissioners at which the report of the engineers was submitted and considered, another petition, signed by the owners of more than two-thirds in area of the land within the drainage district, was presented, requesting the board of commissioners to undertake the drainage and reclamation of all the land in the district, in the manner advised by the board of state engineers, and to provide the necessary funds for that purpose, to incur a debt, and issue bonds bearing interest at 5 per cent. per annum, payable semi-annually, to run for a period not longer than 40 years, to the amount of $14 per acre on each and every acre of land within the district, and requesting that, in pursuance of the provisions of the Constitution and laws of this state, an acreage tax or forced contribution be levied, from year to year, against each and every acre of land in the district, sufficient to pay the debt and interest on it and to maintain the drainage of the district. In accordance with the recommendations of the state board of engineers and the petition of the landowners in the district, the board of commissioners thereupon adopted a resolution, resolving to proceed at once to drain and reclaim all of the land in the district. The debt was thereby incurred to the amount of $358,500—that is, to the extent of $14 an acre—against all of the land composing the district. As evidence of the debt, the resolution provided for the issuance by the drainage district, through the board of commissioners as its governing authority, of 717 negotiable bonds for $500 each, bearing interest at 5 per cent. per annum, payable semiannually. Accordingly, bonds to the amount of $358,500 were issued and sold by the board of commissioners, and the proceeds were expended for the cutting of canals, building levees, and purchasing and installing the pumping plant for draining and reclaiming all of the land within the district.

When the work was completed and the pumping plant put into operation, it was found that, although some of the land within the district was adequately drained, an area of 2,496 acres lying between the forks of Bayou Barataria and Harvey Canal was not, and could not be, drained or reclaimed by the system installed as recommended by the board of engineers. That area, being low, wet land, unfit for cultivation without complete drainage, and incapable of being drained except by pumping the water from it, was therefore not improved by the partial drainage furnished by the system provided for the whole district, unless something more was to be done. Therefore in January, 1916, the

three owners of the 2,496 acres, belonging to two corporations and one individual, requested the commissioners of the drainage district to create a subdistrict, to be known as subdrainage district No. 1, defining the limits of the subdistrict so as to embrace only the area of 2,496 acres belonging to the three petitioners, who were not benefited by the drainage system already provided. The petitioners requested the drainage commissioners to have the state board of engineers prepare plans and specifications and furnish estimates of the cost of completely draining the area within the subdistrict. In accordance with the provisions of section 1 of Act No. 227 of 1914, the drainage commissioners, by a resolution of the board, created the sub-drainage district No. 1, defining the limits of the subdistrict so as to embrace only the 2,496 acres of land of the three petitioners that was not drained by the general system then in operation. And, by a resolution of the board, the commissioners called upon the state board of engineers to make an investigation of the practicability of completely draining the subdistrict No. 1, and to furnish an estimate of the cost of the work.

The engineers ran the levels, made the surveys and estimates, and reported to the board of commissioners of the drainage district that the proposed drainage and reclamation of the subdistrict No. 1, by means of canals, levees, and pumps, was practicable and feasible; that the cost of the works required, taking into consideration the drainage system already in operation throughout the district, would be $23,675, that is, approximately $9.48 an acre for the 2,496 acres in the subdistrict; and that the additional cost of maintaining the drainage of the subdistrict would be about $1.25 per acre. When that report was submitted, the three owners of all the land in the subdistrict presented another petition to the board of commissioners of the drainage district, requesting the board to incur an additional debt of about $9.48 per acre

upon or against each and every acre of land within the subdistrict No. 1, that is, a total additional debt of $23,675 against the 2,496 acres of land in the subdistrict, and requesting that, to represent that indebtedness, the board issue negotiable bonds for $23,675, bearing interest at 5 per cent. per annum, payable semiannually, to run not longer than 40 years, and to levy, from year to year, an acreage tax or forced contribution upon or against the lands in the subdistrict for an amount sufficient to pay the bonds and the interest thereon and the cost of maintenance of the drainage of the subdistrict. In accordance with the recommendations of the state board of engineers and the petition signed by the owners of all of the land in the subdistrict, the board of commissioners, at a meeting held on the 14th of March, 1916, adopted a resolution, resolving to proceed at once to drain and reclaim the 2,496 acres of land comprising the sub-drainage district No. 1. The additional debt was thereby incurred to the amount of $23,675, that is, about $9.48 per acre upon the 2,496 acres of land comprising the sub-drainage district No. 1; and, as evidence of the debt, the resolution provided for the issuance by the sub-drainage district No. 1 through the board of commissioners of the Jefferson and Plaquemines drainage district, as its governing authority, of 237 negotiable bonds, 236 for $100 each, and 1 for $75, bearing interest at 5 per cent. per annum, payable semiannually, and running for a period of from 5 to 40 years.

The Whitney-Central Trust & Savings Bank entered into a contract to purchase from the board of commissioners of the drainage district the bonds of the sub-drainage district No. 1, to the amount of $15,000, at 95 per cent., provided the bonds should be valid. That bank had already bought some of the bonds of the original issue of $352,500 of the Jefferson and Plaquemines drainage district. When the bonds of the sub-drainage district No. 1, to the amount of $15,000,

were tendered and offered for sale to the bank by the board of commissioners of the drainage district, the bank declined to purchase them, on the advice of the attorneys for the bank that the bonds were not valid. This suit was brought to compel the bank to comply with its contract to purchase the bonds. A petition of intervention was filed by the three owners of all of the land in subdrainage district No. 1, ratifying and confirming the proceedings of the board of commissioners, the debt incurred, bonds to be issued, and the acreage tax or forced contribution to be imposed upon or against the land in the subdistrict, and praying that judgment be rendered as prayed for in the plaintiff's petition. Judgment was rendered in the district court in favor of the defendant, rejecting the plaintiff's demand and dismissing the suit. The plaintiff and interveners have appealed. The district judge has not given any written reasons for the judgment, except that the law and the evidence were in favor of the defendant and against the plaintiff.

## Opinion.

The defendant's contention is that the board of commissioners of the drainage district had no authority to create a subdistrict, as a taxing district, after having adopted the plan of draining and reclaiming the entire district as a unit, and having incurred a debt and issued negotiable bonds against all of the land in the district as a unit. The defendant concedes that the board of commissioners had the option, when the drainage district was organized and before any debt was incurred or bonds were issued against the lands in the district, either to divide the district into subdistricts and incur a debt and issue negotiable bonds against the lands in each subdistrict as a separate unit for taxation, or to adopt the entire district as a unit and incur a debt and issue negotiable bonds against all the land in the district. But the defendant contends that, having adopted the latter plan, and having incurred a debt and issued bonds against all of the lands in the district as a unit for taxation, the authority of the board of commissioners is now limited to the right to issue additional bonds against all of the lands in the district to complete the reclamation and drainage of the entire district. It is not disputed that the acreage tax or forced contribution necessary to pay these additional bonds, and the interest on them, and to provide for the maintenance of the drainage of the lands in the subdistrict, is, notwithstanding the original acreage tax or forced contribution required to be levied each year upon all of the land in the entire drainage district, below the maximum permitted by the provisions of the Constitution and laws of this state. Nor is it contended that the payment of the additional bonds issued against the land in the subdistrict is not secured by a safe margin of value, if the bonds are valid obligations. In fact, the defendant's only objection to taking the bonds is that they are not valid obligations; and the only ground on which the validity or legality of the bonds is contested is that the board of commissioners had no authority to subdivide the district and incur the debt and issue the bonds against the lands only in the subdistrict, after having incurred a debt and issued negotiable bonds for the drainage and reclamation of all of the lands in the district as a unit.

The law on the subject of drainage districts, as far as this case is affected, is contained in article 281 of the Constitution of 1913 (as amended by Act No. 192 of 1914, being a joint resolution, which was adopted at the congressional election in November, 1914), and in the Act No. 317 of 1910; sections 17 and 18 of that statute having been repealed, and sections 21, 24, and 28 amended and reenacted, by the Act No. 219 of 1912, and sections 1, 2, 6, 7, 8, 9, 13, 19, 20, 21, 22, 27, 28,

and 29 of the act of 1910 having been amended and re-enacted by the Act No. 227 of 1914. It appears that certain changes were made in the law on the subject of drainage districts at the last session of the Legislature. For example, section 1 of the Act No. 227 of 1914 was amended and re-enacted by the Act No. 225 of 1916; section 7 was amended and re-enacted by the Act No. 77 of 1916; certain provisions were made for the issuance of bonds to complete a system of drainage, of which 80 per cent. was done, by the Act No. 90 of 1916; certain additional authority was given to drainage commissioners, particularly with regard to contracting with commissioners of navigation districts, by the Act No. 242 of 1916; and the compensation allowed the tax collector for collecting drainage taxes was fixed by the Act No. 214 of 1916. But the statutes enacted in 1916 do not affect the issues involved in this case, which was filed in May of that year.

The provisions of the Constitution and statutes of this state, authorizing the creation of drainage districts and sub-drainage districts and the incurring of debts and issuing of negotiable bonds for the drainage and reclamation of lands embraced within drainage districts and subdistricts, are very comprehensive and disclose a disposition on the part of the Legislature and the electors to give a wide latitude of discretion to the boards of drainage commissioners and the property owners within drainage districts and subdistricts. It seems to have been the purpose of the Legislature to provide by statute for every conceivable contingency that might arise, and to leave nothing for interpretation by the courts.

It is not contended by the learned counsel for the defendant that there is any express prohibition in the Constitution or statutes to forbid the board of commissioners of a drainage district, after having incurred a debt and issued bonds against all the land in the district, to divide the district into subdistricts and incur an additional debt and issue additional bonds against or upon the land in any particular subdistrict to give better or additional drainage to the lands in the subdistrict. But the learned counsel for the defendant contend that the intention to forbid such procedure, or change of procedure, by the drainage commissioners, is disclosed in the third paragraph of article 281 of the Constitution, as amended by the Act No. 192 of 1914; and that that intention appears also in sections 1 and 22 of the Act No. 317 of 1910, as amended by the Act No. 227 of 1914.

The provisions of paragraph 3 of article 281 of the Constitution, as amended, referred to in the brief of the learned counsel, are as follows, viz.:

"When the character of any land is such that it must be leveed and pumped in order to be drained and reclaimed the board of drainage commissioners of the district in which the land is situated shall, upon the petition of landowners, whether individuals or corporations, resident or nonresident, owning not less than a majority of acres in the area to be affected, ascertain the cost per acre of draining and reclaiming said land incur debt against each and every acre of land thus situated for an amount sufficient to drain and reclaim it, and (to) issue for such debt negotiable bonds for the total aggregate amount of the total cost of such drainage, which bonds shall run not longer than forty (40) years from their date and bear interest at a rate not exceeding five per centum per annum, payable annually or semiannually, and shall be sold for not less than ninety per centum (90%) of par; and said board of drainage commissioners shall, each year, as long as any bonds are outstanding, levy annually upon each and every acre of land, whether public or private, situated in said drainage or sub-drainage district, forced contributions or acreage taxes in an amount per acre sufficient to maintain the drainage of the said district or sub-drainage district, to pay the interest annually or semiannually and the principal falling due each year, or such amount as may be required for any sinking fund for the payment of said bonds at maturity, provided that such forced contributions of acreage taxes for all purposes shall never exceed three dollars and fifty cents ($3.50) per acre per annum."

The learned counsel for the defendant lay great stress upon the provision in the third paragraph of article 281 of the Constitution that the board of drainage commissioners,

having ascertained the cost per acre of draining and reclaiming the land in a drainage district, shall incur a debt against each and every acre of land thus situated for an amount sufficient to drain and reclaim it, and shall issue for such debt negotiable bonds for the total aggregate amount of the total cost of such drainage. Manifestly, the word "to," in the expression, "and to issue" etc., is a misprint in the Constitution, and should either be omitted or read "shall," to correspond with the first part of the sentence in which it is used. The provision of the Constitution referred to does not appear to us to have the meaning ascribed to it by the learned counsel for the defendant, or to have any reference whatever to the question at issue.

Section 1 of the Act No. 317 of 1910, as amended and re-enacted by the Act No. 227 of 1914, does not, in our opinion, disclose an intention on the part of the Legislature to forbid the board of commissioners of a drainage district, after having incurred a debt and issued bonds against all the land in the district, to create a subdistrict within the district and incur an additional debt and issue additional bonds against and upon the lands embraced within the subdistrict. That section of the statute, in full, is as follows, viz.:

"Be it further enacted, etc., that the police juries of the various parishes of the state of Louisiana are authorized and empowered, upon their own initiative, to divide their respective parishes into one or more drainage districts. Such districts to be known as drainage districts, with such other name or number as the police jury may designate; provided that no such district shall contain, within its limit, less than five landowners; and provided further, that the police jury with the concurrence of the drainage commission may at any time prior to the incurring of debt, issuing bonds or levying a tax based upon the vote of the property owners in such drainage district, change the boundaries of such drainage district so as to enlarge or diminish the same, or to repeal entirely the ordinance creating the drainage district. In all cases wherein drainage districts have been or will be organized by the action of police juries under the provisions of this act, and the drainage commissioners should deem it expedient, or necessary

for the better drainage of the district, to divide the same into sub-drainage districts, they shall have the right to do so by a simple resolution to that effect, defining the limits of such sub-drainage district. Such sub-drainage district may be increased or diminished, and the boundaries thereof changed, by simple resolution of the board of drainage commissioners, if such action is taken prior to the authorization to issue bonds or levying of a tax in such sub-drainage district based upon a vote of the property taxpayers in such sub-drainage district. If, however, such sub-drainage district is created for the purpose of reclaiming lands that must be leveed and pumped in order to be drained and reclaimed, then the limits of such district may be changed at any time and other lands included therein, upon the petition of at least two-thirds (⅔) of the acres represented by owners owning the additional territory to be included and a like number of petitioners of the territory already included in such sub-drainage district. That the enlargement of such a sub-drainage district shall not in any manner affect any bonds that may have been issued against the property situated in said sub-drainage district, and the board of drainage commissioners shall have the authority to issue bonds for a like amount per acre upon the additional property embraced in the drainage district and to levy an acreage tax or forced contribution to pay the interest and principal of such bonds, together with the maintenance of the drainage district; and all such bonds when thus issued shall be issued upon the same terms and conditions and shall be equal in every respect to the bonds already issued and shall be regarded as one issue all resting upon the same sub-drainage district, and there shall be no preference or priority given or distinction made on account of some of the bonds of the district having been issued prior to the issuing of others. Such sub-drainage district shall be composed of, and acreage taxes shall be levied on lands only that are especially benefited by the particular reclamation or drainage that is proposed to be inaugurated for the purpose of draining the same and may be composed entirely of the lands of one individual or corporation. That all sub-drainage districts the boundaries of which have been enlarged and bonds issued upon additional land embraced therein are hereby declared to be valid and existing sub-drainage districts, and such bonds are hereby declared to be valid and binding obligations of the district and incontestible for any cause after sixty (60) days have expired from the date of the promulgation of the proceedings evidencing the issuing of said bonds."

There is nothing in the foregoing section of the law that, expressly or by implication, forbids the commissioners of a drainage district to create a subdistrict and incur an additional debt and issue additional bonds against or upon the land in the subdistrict, after having already incurred a debt and issued bonds

against all of the land in the district. On the contrary, the statute declares that, in all cases wherein drainage districts have been or will be organized by the action of the police juries under the provisions of the act, if the drainage commissioners should deem it expedient or necessary for the better drainage of the district to divide the same into sub-drainage districts, they shall have the right to do so by a simple resolution to that effect, defining the limits of such sub-drainage district. If the intention of the Legislature had been to prohibit the drainage commissioners from dividing the drainage district into sub-districts, for the better drainage of the district, after having already incurred a debt and issued bonds against all of the land in the district, that intention could have been expressed very easily, and we have no doubt that it would have been expressed. In support of our belief in that respect, we call attention to the fact that, in authorizing the police jury, with the concurrence of the drainage commissioners, to change the boundaries of a drainage district so as to enlarge or diminish its area, the Legislature was careful to provide that it could not be done after the incurring of a debt and the issuing of bonds and the levying of a tax based upon a vote of the property owners in the district; that is, for gravity drainage. We observe, also, that the provisions of the statute are very explicit with regard to increasing or diminishing the area or changing the boundaries of a subdistrict. The Legislature was careful to provide that such a change of area or boundaries of a subdistrict should not be made after the authorization to issue bonds or levy a tax on the land in the subdistrict, based upon a vote of the property taxpayers in the subdistrict; that is, for gravity drainage. But, in the provision authorizing the drainage commissioners to divide a drainage district into subdistricts, by a simple resolution to that effect defining the limits of such sub-

district, whenever the drainage commissioners might deem it expedient or necessary for the drainage of the district, the Legislature did not impose the condition that the drainage commissioners should not divide the district into subdistricts after having incurred a debt and issued negotiable bonds against or upon the entire district, on the petition of the owners of two-thirds of the area of land in the district, for drainage and reclamation by leveeing and pumping. The provisions of the statute are so explicit in all other respects that there is no reason to believe that the failure to impose any such condition upon the authority of the drainage commissioners to subdivide the drainage district into subdistricts, by a simple resolution to that effect, whenever they deemed it expedient or necessary for the better drainage of the district, was a mere inadvertence on the part of the Legislature, especially as we cannot conceive of any good reason why such restriction or limitation should have been imposed.

In support of the argument that the board of commissioners of the drainage district, after having incurred a debt and issued bonds against all of the land in the district, could not divide the district into subdistricts and incur an additional debt and issue additional bonds against or upon the land embraced in a particular subdistrict, for the better drainage of that subdistrict, the learned counsel for the defendant point out that the Legislature has provided another method of procedure for a case like this; that is, where it has been found that a mistake was made in estimating the cost of draining and reclaiming all the land in the district and that a larger amount than was originally contemplated was necessary must be expended in order to drain and reclaim all the land in the district. They refer to the second paragraph of section 22 of the Act No. 227 of 1914, which paragraph was added to that section

of the Act No. 317 of 1910, when it was re-enacted by the act of 1914.

As originally enacted, section 22 of Act No. 317 of 1910 read as follows:

"That, in all drainage districts or sub-drainage districts that are formed for the purpose of reclaiming lands and when bonds are issued for said purpose based upon a forced contribution or acreage tax, the authority issuing said bonds may fix the first maturity of such bonds not longer than five years from the date of issue, during which time the drainage of such drainage district or sub-drainage district shall be completed."

In the re-enactment of that section of the law, in the Act No. 227 of 1914, the following paragraph was added, viz.:

"That in issuing bonds for the purpose of reclamation where the character of the land is such that it must be leveed and pumped in order to be drained and reclaimed, the drainage commissioners of such drainage district may issue at one time, and as one series bonds, to the total amount necessary for the purpose of completing the drainage, or they may issue such bonds in one or more series and at different times, or if, after the work has progressed, any disaster shall befall the district, by which the works are injured or destroyed, and a greater amount than first contemplated was necessary to be expended, or if it was found that some error or mistake had been made as to the cost and that a greater amount than was contemplated originally was necessary to be expended in order to drain and reclaim the lands, then additional bonds may be issued, which bonds shall have the same maturities, bear the same rate of interest and be equal in every respect to the bonds previously issued, provided, that bonds shall not be issued in a sum per acre greater than that a forced contribution of three dollars and fifty cents ($3.50) per acre per annum will be sufficient to pay the interest on the said bonds, the fraction of the principal due each year, and the cost of maintaining the drainage."

It is contended by the learned counsel for the defendant that, since it has been found that, on account of a mistake in estimating the cost of draining and reclaiming all of the land in the district, an additional debt must be incurred to drain and reclaim the land in the sub-drainage district No. 1, the property owners may, by presenting a petition to the board of commissioners of the drainage district, signed by the owners of two-thirds in area of all of the land in the district, compel the board to incur an additional debt and is-sue additional bonds upon or against all of the land in the district. That method of procedure, in case of an error in the estimate of the cost of a draining and reclamation project, could not have been contemplated when the owners of more than two-thirds of all the land in the district requested the board of commissioners to incur the debt and issue bonds to the amount of $14 an acre, a total of $352,500 on all the land in the district; because the second paragraph of section 22 of the Act No. 227 of 1914 had not been enacted when the debt was contracted and the bonds were issued against all the lands in the district. There is no reason to believe that the owners of two-thirds of the 26,000 acres of land in the drainage district would be willing to sign a petition, requesting the board of commissioners to impose an additional debt and tax upon their land to drain and reclaim only the 2,496 acres of land in the sub-drainage district. Besides, to hold that the remedy provided by the second paragraph of section 22 of Act No. 227 of 1914 is now the only remedy for correcting a mistake made in the estimate of the cost of a drainage and reclamation project, and the only means of incurring an additional debt to complete the drainage and reclamation, would be the same as to say that there was no remedy whatever for such a mistake before section 22 of the Act No. 317 of 1910 was amended by the statute of 1914. And that would mean that there was no remedy, prior to the adoption of the amending statute of 1914, for the owners of the 2,496 acres of land in the subdistrict that was not improved or benefited at all by the debt incurred and bonds issued against it, unless the owners of two-thirds of the entire 26,000 acres would be so magnanimous as to consent to incurring an additional debt and issuing additional bonds and levying additional taxes against their land for the exclusive benefit of the owners of the 2,496 acres

of land in the subdistrict. There was no such hiatus in the statute of 1910. It authorized the board of commissioners to create a subdistrict by a simple resolution to that effect, defining the limits of the subdistrict, whenever the commissioners deemed it expedient or necessary for the better drainage of the district.

The owners of the lands in Jefferson and Plaquemines drainage district, outside of sub-drainage district No. 1, will have no interest in contesting, or right to contest, the validity of the debt·incurred and bonds to be issued upon or against the land in the subdistrict; because the acreage tax or forced contribution that will be levied upon the land in the subdistrict will not affect the lands outside of the subdistrict. Section 28 of the Act No. 317 of 1910, as amended and reenacted by section 13 of the Act No. 227 of 1914, declares that the landowners in a drainage district or subdistrict may, by unanimous consent, waive the right to resort to the courts, and may absolutely ratify and confirm what has been done by the drainage commissioners, and that the owners of the land in the district or subdistrict will be thereby forever barred from testing or contesting the validity of the proceedings, the bonds issued, or the tax levied by the commissioners. The owners of all of the land in sub-drainage district No. 1 of the Jefferson and Plaquemines drainage district have, in their petition of intervention in this suit, expressly ratified and confirmed all of the proceedings in question in this suit; that is, the creation of the subdistrict, the incurring of the debt, and issuance of the bonds in contest. Hence it appears that no one can ever question the validity of the bonds in contest or of the acreage tax or forced contribution that is to be levied from year to year to pay them. Our conclusion is that the bonds are valid, and that the judgment appealed from should be reversed.

The judgment appealed from is annulled, and it is now ordered, adjudged, and decreed that the defendant, Whitney-Central Trust & Savings Bank, accept and pay for the bonds in question, and, in the event of the defendant's failure so to do within 10 days from the day on which this judgment shall become final, that the plaintiff recover of and from the defendant the price at which the bonds were sold, $14,250, with interest at 5 per cent. per annum from the date on which this judgment shall become final; and that the defendant pay the costs of this suit.

SOMMERVILLE, J., takes no part.